UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

THALLE CONSTRUCTION CO., INC.,

    Plaintiff,

v.                                          Case No.:  2:24-cv-533-SPC-KCD

CHARLOTTE COUNTY, FLORIDA,

    Defendant.
_____/

## **OPINION AND ORDER**

Before the Court is Plaintiff's Emergency Ex Parte Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 3).  Plaintiff moves ex parte for a temporary restraining order (TRO) that enjoins Defendant from awarding a contract to construct and expand a water reclamation facility.  For the below reasons, the Court denies the motion.

### **BACKGROUND**

This case concerns Plaintiff's bid to construct and expand the Burnt Store Water Reclamation Facility in Charlotte County, Florida.  Defendant requested bids for the project.  Defendant provided that the project's budget would be approximately $89 million and that it would award the contract to the "lowest responsive, responsible bidder, qualified by experience and capable

of providing collateral[.]" (Doc. 1-2 at 1, 4).  Defendant described the expansive scope of the project and required that each bidder "submit a minimum of three (3) recent (within the past five (5) years) references of projects of similar size and scope[.]" (Doc. 1-2 at 22).  Each reference was required to "include a project description, project location, name and phone number of a contact person, total project amount, and completion date." (*Id*.).

Plaintiff bid $171,799,950 to complete the project. (Doc. 1-3).  Along with its bid, Plaintiff provided three references—a $15 million project for the Trinity River Authority, a $108 million project for the City of Round Rock, and a $25 million project for the Orlando Utilities Commission.  (Doc. 1-3 at 9).

Defendant mistakenly rejected the bid as "non-responsible." (Doc. 1-4).  That same day, Defendant explained that it meant to reject the bid as "non-responsive." (Doc. 1-5).  The problem—Plaintiff's references "d[id] not meet the criteria of the three . . . references of similar size and scope." (*Id*.).  Plaintiff protested.  (Doc. 1-8).  But Defendant explained its decision, noting that two of Plaintiff's three references were not of a similar size and scope when compared to the Burnt Store Project.  (Doc. 1-9).  Defendant plans to award the project to another contractor whose bid exceeded Plaintiff's by more than seven million dollars.  This suit followed.

## LEGAL STANDARD

A district court may issue a temporary restraining order without notice to the adverse party if the movant provides:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1)(B); *see also Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 439 (1974) (ex parte TROs "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer").

If the movant establishes that it is justified in seeking ex parte relief, it then must show that injunctive relief is appropriate.  The movant may do so by showing "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the nonmovant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. Rel Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005).

## ANALYSIS

To start, the Court finds that it may issue this Order without notice to Defendant because Plaintiff has presented specific facts in its motion that show it will experience substantial harm before Defendant can be heard in opposition. Plaintiff represents that Defendant intends to award the project to another contractor tomorrow, June 11, 2024. Given this timeline, it would be impossible to obtain a response and hold a hearing on a preliminary injunction before the act Defendant wishes to enjoin. Moreover, pursuant to Rule 65(b)(1)(B), Plaintiff's attorney has certified this in writing and represents that it has emailed a copy of the complaint to the Charlotte County Attorney's Office and would contemporaneously provide a copy of the TRO motion by email. (Doc. 3 at 25).

Even without the benefit of Defendant's argument, however, the four TRO requirements do not support injunctive relief. The Court starts and ends with the likelihood of success on the merits. "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). Plaintiff has not shown a substantial likelihood of success on the merits, so the Court must deny the TRO motion.

Florida Statute § 255.20 is the starting point. That provision mandates that a "county . . . seeking to construct or improve a public building, structure, or other public construction works must competitively award to an appropriately licensed contractor each project that is estimated to cost more than $300,000." Fla. Stat. § 255.20(1). "Competitively awarding" a project means that a bidder "is assured fair consideration of his offer, and is guaranteed the contract if his is the lowest and best bid received." *Emerald Corr. Mgmt. v. Bay Cnty. Bd. of Cnty. Comm'rs*, 955 So. 2d 647, 652 (Fla. Dist. Ct. App. 2007). A county has "wide discretion" in awarding projects, and "its decision, when based on an honest exercise of this discretion, will not be overturned by a court even if it may appear erroneous and even if reasonable persons may disagree." *Liberty Cnty. v. Baxter's Asphalt & Concrete, Inc.*, 421 So. 2d 505, 507 (Fla. 1982). But a county may not exercise its discretion arbitrarily or capriciously. *Emerald Corr. Mgmt.*, 955 So. 2d at 652. Generally, whether the county acts arbitrarily is determined by whether it complied with its own proposed criteria in its request for bids. *Id.* at 653.

Here, Defendant described the expansive scope of the project and required that each bidder "submit a minimum of three (3) recent (within the past five (5) years) references of projects of similar size and scope[.]" (1-2 at 22). Defendant required that each reference "include a project description, project location, name and phone number of a contact person, total project

5

amount, and completion date." (*Id.*). After reviewing Plaintiff's bid, Defendant determined that two of Plaintiff's three references were not of projects of a similar size and scope. So, Defendant found that Plaintiff's bid was non-responsive. *See* Fla. Stat. § 255.248(7) (defining "responsive bid" as a bid "which conforms in all material respects to the solicitation").

Specifically, Defendant highlighted Plaintiff's project for the Trinity River Authority and the Orlando Utilities Commission project. Defendant found that these references were not of a similar size and scope compared to the Burnt Store Project. Defendant reiterated the scope of the Burnt Store Project:

> [T]he Scope of Work for the project is to "furnish all material, labor, equipment, and all other associated appurtenances required to successfully complete the construction of expanding the Burnt Store Water Reclamation Facility (WRF) from 0.5 to 2.5 MGD." The Bid Package further elaborates that the major unit treatment processes and facilities in the expansion includes: "headworks structure (preliminary treatment), odor/corrosion control, inline flow equalization, equalization station, 5-stage Bardenpho treatment system (two trains), supplemental carbon feed system for post-anoxic denitrification, and ferric sulfate feed system for phosphorus polishing, clarifier flow splitter box, two (2) secondary clarifiers, return and waste activated sludge pump station, tertiary treatment (sand filtration), chlorine contact basin splitter box, chlorine contact basin, and sodium hypochlorite disinfection system, effluent transfer pump station, structural piles, yard piping, piping upgrades and connection to existing injection well, reclaimed ground storage tank, pond conversion to reclaimed and reject water storage ponds, reclaimed water (RCW) high-service pump station, modification of the existing biological treatment tanks and secondary

6

>clarifiers to aerated sludge holding tanks and pump station, plant drain and plant service pump stations, electrical buildings and standby (emergency) power facilities, instrumentation and controls including SCADA, septage receiving area and tailing bed, decommissioning and demolition of existing treatment facilities, security fencing, landscaping buffer, all site surveys, investigations, geotechnical, related civil/site work, equipment, piping, any bypass or diversions necessary, and related appurtenances for the Burnt Store WRF 2.5 MGD Expansion."

(Doc. 1-9 at 1-2). Defendant explained how the Burnt Store Project—estimated to cost approximately $89 million and bid at over $170 million—"far exceeds the scope of work and relative size" of two of Plaintiff's references.

Defendant explained how one reference—the Trinity River Authority (CRWS Regional Wastewater System Phase IIIB Filter Improvements) project—is insufficient. This reference project "merely included demolition, removal of sand, partitions, and filter plates; removal of associated electrical and instrumentation, decommissioning/modifying filters, and site work," at a cost of around $15 million. (Doc. 1-9 at 2). But demolition "is only a small fraction of the scope of work for the Burnt Store Project." (*Id.*). So Defendant found the Trinity River Authority project insufficient to meet the requirement that references be of similar size and scope.

Defendant found another reference—the Orlando Utilities Commission (Orlando Utilities Commission SEC Lined Pond) project—similarly insufficient. This reference project included "Construction of a Recycle Basin

Expansion Pond, a complete replacement with the specified improvement modifications and associated infrastructure of three of the lined ponds in the Lined Pond Storage System," at a cost of around $25 million. But Defendant observed that "pond construction is only a fraction of the broad Scope of the Work contemplated in the Burnt Store Project, again as outlined above, which encompasses far more than construction of lined ponds." (Doc. 1-9 at 2). So Defendant found the Orlando Utilities Commission project insufficient to meet the size and scope criteria.

With these two references falling short, Defendant was left with a single reference from Plaintiff. But Defendant "requires three references of similar size and scope in all of its construction bids because it needs to assess whether bidders have the depth and breadth of skill and length and breadth of experience to complete County construction projects." (Doc. 1-9 at 2). Defendant explained that this requirement is particularly important here, as the Burnt Store Project is "extremely large and complex." (*Id.*).

Defendant's decision was likely not arbitrary and capricious. Defendant followed its bid criteria and explained in detail why it found two of Plaintiff's three references insufficient in size and scope. Defendant explained that two of Plaintiff's references involved only components of the Burnt Store Project. Those projects had costs of approximately $15 and $25 million in comparison

8

to the Burnt Store Project's estimated $89 million in costs (which was ultimately bid at over $170 million).

Plaintiff argues that it "submitted *references* which exceed the $89 million face value[.]" (Doc. 3 at 14) (emphasis added). Not so. Only one of Plaintiff's references exceeded $89 million. Plaintiff seems to think that Defendant was obligated to add up its references, component by component, to determine whether they met the size and scope requirement. But Defendant required *three* separate references of similar size and scope. Adding the references into a single project of similar size and scope would eliminate Defendant's requirement that a bidder have three references. But, as Plaintiff acknowledges, it is the criteria in the request for bids that generally determines whether a county acts arbitrarily.

Plaintiff speculates that the duration of its reference projects shows they are of similar size and scope as the Burnt Store Project. Defendant advertised that the Burnt Store Project must be completed within 900 days. (Doc. 1-2 at 22). Plaintiff argues its reference projects must be of similar size and scope because they took 700, 900, and 1,005 days. Defendant's finding that two of those projects involved only components of the Burnt Store Project cuts against Plaintiff. Common sense suggests that component projects should take significantly less time than a comprehensive job like the Burnt Store Project.

9

Plaintiff also harps on the fact that it is "the contracting arm of the Tully Group, the largest privately-held contractor in the United States." (Doc. 3 at 11; Doc. 1-8 at 3). But, given this fact, the Court (and perhaps Defendant) is puzzled why Plaintiff did not simply provide three projects of similar size and scope. Defendant even acknowledged that Plaintiff "may have" completed such projects, but that was "not evident from the information provided in the bid response." (Doc. 1-9 at 2). And while Plaintiff "may be a member of the Tully Group . . . it was the Thalle Corporation, and not the Tully Group, that bid on the Burnt Store Project." (*Id.*).

In summary, Defendant gave Plaintiff's bid fair consideration. This is not a case of "ignorance through lack of inquiry." Defendant faithfully applied the criteria from its request for bids. And Defendant reasonably found that Plaintiff did not meet the requirement to provide Defendant with three references of similar size and scope. Defendant explained that this failure was material given the size and complexity of the Burnt Store Project. Defendant likely did not act arbitrarily. So Plaintiff has failed to show a substantial likelihood of success on the merits.

Two final points are worth mentioning. First, Plaintiff also fails to offer a specific amount as security to support its request for injunctive relief. *See* Fed. R. Civ. P. 65(c). Plaintiff invites the Court to require no or nominal

security. This request is perplexing given Plaintiff's request that the Court halt the awarding of an over $170 million project.

Second, Plaintiff concedes that this action will be rendered moot when Defendant awards the project to another contractor. Accordingly, on or before **June 17, 2024,** Plaintiff shall show cause why the Court should not dismiss this action as moot. Alternatively, Plaintiff may stipulate to the dismissal of this action before that date.

Accordingly, it is now

**ORDERED:**

1. Plaintiff's Ex Parte Emergency Motion for Temporary Restraining Order (Doc. 3) is **DENIED**.

2. On or before June 17, 2024, Plaintiff must show cause why the Court should not dismiss this action as moot.

**DONE** and **ORDERED** in Fort Myers, Florida on June 10, 2024.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record

11